**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**ANEESHA BRYANT,** :

**Plaintiff** :

**v.** :

**WILKES-BARRE HOSPITAL, COMPANY, LLC,** :

:

**Defendant**

**CIVIL ACTION NO. 3:14-CV-1062**

**(JUDGE MANNION)**

**MEMORANDUM**

Pending before the court is the defendant's motion for summary judgment with respect to all counts of the plaintiff's complaint, (Doc. 33), on the grounds that the undisputed facts demonstrate that plaintiff failed to establish her race discrimination in employment, hostile work environment, and retaliation claims. Based upon review of the briefs and the record, the court will **DENY** the defendant's motion with respect to all of plaintiff's claims since there are several disputed material facts.

## I. PROCEDURAL BACKGROUND

By way of relevant background, the plaintiff, Aneesha Bryant, filed the instant action, (Doc. 1), on June 2, 2014, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*., the Civil Rights Act of

1870, 42 U.S.C. §1981, as well as state law, the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §955. Plaintiff seeks declaratory relief under 28 U.S.C. §2201 and 28 U.S.C. §2202. Plaintiff attached as exhibits (A & B) to her complaint a copy of her November 26, 2012 Charge of Discrimination she filed with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), (Doc. 1, at 24-29, Ex. A), and a copy of her August 28, 2012 resignation letter from her employment with defendant to Lisa Cernera, the Director of Surgery, (Doc. 1, at 29, Ex. B). The defendant is plaintiff's prior employer, Wilkes-Barre Hospital Company, LLC ("WBHC"), doing business as Wilkes-Barre General Hospital (the "Hospital"), located on North River Street, Wilkes-Barre, Pennsylvania.

In Count I of her complaint, plaintiff raises a claim of race discrimination in violation of Title VII. In Count II, plaintiff raises a claim of race discrimination under §1981. In Count III, plaintiff raises a retaliation claim under Title VII, and in Count IV, she asserts a retaliation claim under §1981. In Count V, plaintiff raises a claim of race discrimination under §955(a) of the PHRA. In Count VI, plaintiff raises a claim of retaliation under §955(d) of the PHRA. In Count VII, plaintiff raises a claim of racial harassment under Title VII, and in Count VIII (mislabeled as Count VII), plaintiff asserts a claim of racial harassment under §1981.Finally, in Count IX, plaintiff raises a claim of racial harassment under §955(a) of the PHRA.

As relief, plaintiff seeks a declaratory judgment that defendant engaged in discrimination in violation of state and federal law, a permanent injunction enjoining defendant from discriminating against its employees based on their race, back pay, front pay, compensatory and punitive damages, as well as costs and attorneys' fees.

This court has subject matter jurisdiction over plaintiff's federal claims based on 28 U.S.C. §1331 and 28 U.S.C. §1343(a), and on 42 U.S.C. §2000e-2(a). The court can exercise jurisdiction over plaintiff's pendent state claims under 28 U.S.C. §1367. Venue is proper in this court under 28 U.S.C. §1391 since the alleged unlawful employment practices occurred in the Middle District of Pennsylvania.

After defendant was served, it filed an original motion to dismiss the complaint on July 21, 2014, pursuant to Fed.R.Civ.P. 12(b)(6), and argued, in part, that plaintiff failed to exhaust her administrative remedies with respect to her race-based discrimination, harassment and retaliation claims under Title VII and the PHRA. Subsequently, defendant was advised by plaintiff that she received a Notice of Right to Sue from the EEOC dated July 15, 2014. Thus, defendant withdrew its original motion to dismiss. (Doc. 9). On July 22, 2014, defendant filed an amended motion to dismiss plaintiff's complaint under Rule 12(b)(6), 12(f), and 12(e). (Doc. 10). On February 10, 2015, the court denied defendant's amended motion to dismiss plaintiff's complaint in

its entirety. (Docs. 23, 24). Defendant filed its answer to the complaint with affirmative defenses on March 2, 2015. (Doc. 27).

After discovery, defendant filed a motion for summary judgment, pursuant to Fed.R.Civ.P. 56, with respect to all of plaintiff's claims on July 8, 2015. (Doc. 33). On July 14, 2015, defendant filed its statement of material facts with exhibits, (Doc. 34), and its brief in support on July 22, 2015, (Doc. 35). On August 17, 2015, plaintiff filed her response to defendant's statement of material facts with exhibits and her counter statement of material facts, (Doc. 36), and her brief in opposition to defendant's motion, (Doc. 37). Defendant filed its reply brief on August 31, 2015, (Doc. 38). Plaintiff, with leave of court, filed a sur reply brief on September 18, 2015, (Doc. 41). As such, defendant's motion for summary judgment is ripe for disposition.

As indicated, plaintiff submitted a Charge of Discrimination with the EEOC and the PHRC signed on November 26, 2012, alleging discrimination, harassment, retaliation and constructive discharge due to race, color and national origin. (Doc. 1, at 24-29, Ex. A). Plaintiff received a Notice of Right to Sue from the EEOC dated July 15, 2014.[1]

[1]Plaintiff must exhaust her administrative remedies before she can file a Title VII action and an action under the PHRA in federal court. *See McIntyre v. City of Wilmington*, 360 Fed. Appx. 355, 356 (3d Cir. 2010)(citation omitted); *Kern v. Schuylkill Inter. Unit 29*, 2010 WL 235107, *3 (M.D. Pa.).

## II. MATERIAL FACTS[2]

Plaintiff, an African-American, began her employment with defendant in March of 2009, as a part-time Operating Room Scheduling Specialist. During her employment with defendant, plaintiff was one of three Operating Room Scheduling Specialists. At all relevant times, the Scheduling Specialists, including plaintiff, were physically located in the Hospital's Ambulatory Surgery Center ("ASC"). Specifically, in October 2010, the Hospital's Operating Room Scheduling Specialists' work location was moved from the main hospital building to the Hospital's ASC. (Doc. 34-3). Plaintiff was the only person of color who worked in the ASC. Plaintiff did not recall having any duties and responsibilities within the ASC. Plaintiff was responsible for the scheduling of surgeries in the main operating rooms of the Hospital as well as in the Hospital's Center for Same Day Surgery ("CSDS"). The Scheduling Specialists did not have any supervisory duties.

Plaintiff's scheduling work was performed on a computer provided by the Hospital and she also used paper documentation to perform her duties. Plaintiff had the complete operating room schedule electronically on her computer. As a Scheduling Specialist, plaintiff's job duties consisted of taking phone calls from physicians or their staff to schedule surgeries in one of the

---

[2]The facts are derived from the statement of material facts and the response to it as well as the counter statement of material facts and the exhibits.

Hospital's main operating rooms or in the CSDS and then scheduling the requested surgery in an available operating room at an available time with the appropriate Hospital staff. The Scheduling Specialists would also make the surgery schedules available for the staff, including the schedules for the main operating rooms and the same day surgery center. The schedules for both were available to plaintiff on her computer screen but at times she needed a paper version of the schedule when there was a change, such as if a surgery was canceled and another one was re-scheduled. At times, the cancellation may have been noted on a piece of paper and it was later placed on the computer. The schedule was clearer when it was printed in paper version since it would show which doctor was in what room at one time, how many doctors were scheduled in that operating room, what time the surgery was, and what time the surgery was going to end. Also, the boxes on the computer version of the schedule were very small and one could not see what type of surgery was occurring in the operating room. However, when the schedule was printed, you could see the type of surgery to be performed.

Additionally, nurses who worked at night in the Hospital's operating room may have to change a surgery on the schedule when directed to do so by the doctor and they would just write down the change on paper since they did not know how to manage the schedule on the computer. The next morning when the paper message was delivered to the Scheduling Specialists, the

change in the schedule would then be placed into the computer. Plaintiff was also responsible for transcribing the data from the written operating room report into the computer and for filing the report in the surgery folder for that particular day.

At times, plaintiff would receive a fax request from a doctor's office to schedule surgery and an operating room. She would also receive a marked-up paper copy of the schedule from the night before and be required to input or delete information on the operating room schedule.

Ms. Cernera was plaintiff's immediate supervisor at all relevant times. Cernera was the Hospital's Director of Surgery since October 2012. (Doc. 34-3). Michael Padden, RN, was the Hospital's Director of the ASC since February 2011, and he reported to Cernera. The following personnel reported directly to Padden: the secretary/scheduler for the ASC; two pre-op nurses; four recovery room nurses; four surgical technicians; and four operating room nurses. None of the personnel who reported to Padden had any supervisory duties. Plaintiff did not ever report to Padden. The Scheduling Specialists physically worked in the ASC but they reported directly to Cernera. Padden had no authority to direct any work of the Scheduling Specialists. If the secretary/scheduler for the ASC, who reported to Padden, was absent, the Scheduling Specialists would assist and schedule a case for one of the operating rooms at the ASC.

In August of 2012, Maureen Gaydosh was the secretary/scheduler for the ASC and she reported to Padden. Padden and plaintiff worked in the same building and in the same office suite. According to Amie Stewart, one of the Surgical Technicians in the Hospital's ASC who reported directly to Padden, there was no difference between the CSDS and the ASC, and they were the same. However, Padden stated that the ASC secretary/scheduler would receive the calls and schedule the surgeries for the four operating rooms in the ASC and not the Scheduling Specialists. The Scheduling Specialists would schedule cases for the Hospital's main operating rooms. Only if the ASC secretary/scheduler was absent would the Scheduling Specialist take the call to schedule a case for the ASC's operating rooms. Another distinction between the CSDS and the ASC was that Padden was supervisor of the secretary/scheduler for the ASC and Cernera was Scheduling Specialists' supervisor. (Doc. 34-4, at 5-7).

Glenn Weaver, D.O., is employed by the North American Partners in Anesthesia. Dr. Weaver works as a Staff Anesthesiologist at the Hospital. Dr. Weaver did not have the ability to affect plaintiff's rate of pay, change plaintiff's hours of work, fire plaintiff, and supervise her.

Cernera testified that plaintiff was funny and that every day plaintiff would discuss her race and issues pertaining to race. Cernera also stated that:

> Someone [] commented [about a gentleman and that he] was a good-looking man. [Plaintiff said] oh, trust me, I'd get him compared to you because you know what they say, once you go black. And then one time we were looking at a purse that [plaintiff] thought was nice and she was standing -- it was just her personality. She'd stand provocatively, you know, and she said -- she would say, this purse wouldn't look good for me. It's not big enough to cover my big black ass. Sorry I said that. Every day there was -- you know, she always related to herself as Negro Queen. It was in her everyday conversation.

(Doc. 34-2, at 7).

In her August 2015 Affidavit, plaintiff denied Cernera's testimony. (Doc. 36-1, at 14-15). However, plaintiff testified that it was possible she may have said something in the workplace about her own race that was intended to get a reaction from the person hearing her comment.

It was common for Stewart to be in plaintiff's office and she was a work friend of plaintiff. They would have conversations including conversations about Stewart's family and activities. Stewart also stated that on more than one occasion plaintiff would initiate discussions about things pertaining to race or color. Stewart also stated that:

> Upon one of the first times meeting [plaintiff], I realized her last name was Bryant. I asked her if she was related to Nicole Bryant because I went to school with one -- Nicole Bryant. [Plaintiff] said, no, I'm from New Jersey. And I said, oh. [Plaintiff] said, why? Do you believe that all black people are related? I never stated that the person I formerly knew was black or African-American.

Stewart believed plaintiff made the comments in a teasing manner and

that she smiled afterwards.

Stewart further stated that she had a discussion with plaintiff in July of 2012 about where Stewart and her family were going to go on vacation. Stewart stated that "When [plaintiff] asked me where I was going on vacation, I told her Lake Wallenpaupack with my son and husband, Austin and Ryan. And she said in a tone of voice to use like mine, she said, Lake Wallenpaupack with Austin and Ryan? She said, my God, if that isn't two white names going on a white vacation."

Plaintiff testified that she did not ever joke with anybody in the workplace about the names of their children and, that she could not recall ever joking with anybody in the workplace about the names of their husband and about where anyone was taking their vacations. Nor did Padden ever hear plaintiff discuss or joke about race or color. Also, Padden never heard anybody say that plaintiff joked about race or color. (Doc. 34-4, at 7).

Stewart also testified that after working with plaintiff for two years, she asked plaintiff to repeat a word she said since Stewart did not understand it, namely, "aks". Stewart stated that plaintiff "told me that I must have went (sic) to white school to learn to be whiter." (Doc. 34-5, at 13-15).

In her August 2015 Affidavit, plaintiff denied all of the above averments in Stewart's testimony. (Doc. 36-1, at 14-15).

Additionally, Stewart admitted that she repeated the word "birfday" after

plaintiff said it when plaintiff meant "birthday" and that she had no purpose in repeating the word. Plaintiff then repeated the word "birfday" and laughed about it. Plaintiff alleges that she asked Stewart where she heard such language and Stewart responded the "colored station," referencing Black Entertainment Television. Stewart denied ever using the phrase "colored station" regarding language usage by African-American people. (Doc. 34-5, at 15-16).

Plaintiff alleges that her co-workers made racial comments and jokes about her in the work place. Plaintiff testified that on several occasions at the scheduling desk in the ASC Stewart asked her why she always says "aks", "birfday" and "bafroom". Plaintiff alleges that she objected to Stewart's teasing and told Stewart that she was offended by it, but it continued. Plaintiff testified to three specific occasions when Stewart used the terms "birfday" and/or "aks". However, plaintiff also stated that Stewart made remarks to her about the way she spoke with "birfday" and "aks", and made other references, such as the "colored station" and "bafroom", at least once a week in the year prior to August 16, 2012. (Doc. 34-1, at 29, 83). In fact, plaintiff documented some of these incidents on her Facebook account in August 2011 and August 2012, and indicated that they were getting on her nerves and bothering her a lot. (Doc. 34-10, Doc. 34-1, at 32).

Plaintiff did not complain to management about the three specific

incidents regarding Stewart after they occurred. However, Plaintiff did eventually complain to Padden and Cernera as well as a woman named "Alicia" in Human Resources about the comments made to her. Plaintiff said she had several conversations with Padden. Plaintiff indicated that she did not bring any concerns regarding anything Stewart said to the attention of management until August 16, 2012. It is undisputed that plaintiff first reported the alleged harassing and discriminatory conduct to management on August 16, 2012. After plaintiff expressed her concerns about Stewart's statements to the attention of management, Stewart did not say anything else to her that she thought was offensive. (Doc. 34-1, at 28-29, 32, 42).

Plaintiff also told Helen Rosengrant, a Scheduling Specialist who worked with plaintiff and had a cubicle near plaintiff's, that Stewart's comments were starting to affect her. Rosengrant stated that the comments usually would be in a joking manner, but race would come up a lot in the jokes. Since plaintiff was the only African American who worked in the ASC office, the comments would be friendly jokes but "uncomfortable." Rosengrant believed lines had been crossed by uncomfortable joking and comments directed at plaintiff by co-workers with regard to her race. Rosengrant stated that plaintiff's co-workers frequently made "fun of the way she said certain words that ...was pretty much due to her race" and, that the humor of her co-workers was "about [plaintiff's] race a lot." Rosengrant stated that the

manner race was used in a lot of jokes regarding plaintiff was offensive and made her uncomfortable. Rosengrant added that "[t]hey were seemingly little things, but I think all together they kind of were a pattern of being very focused on [plaintiff's] race." (Doc. 34-8, at 4-6, 14).

Plaintiff also specified an occasion, on August 16, 2012, when Dr. Weaver, an anesthesiologist who was contracted to work at the Hospital and who was regularly in the ASC, used the terms "aks" and "birfday". Plaintiff also identified another occasion, prior to August 16, 2012, when Dr. Weaver asked her "Why do black people eat chicken and watermelon." Plaintiff did not complain to management at the time Dr. Weaver made his statement to her and but was offended by it. Plaintiff later reported this incident to the management of the Hospital on August 16, 2012. After August 16th, Dr. Weaver never said anything else to plaintiff that she thought was offensive. (Doc. 34-1, at 42).

Dr. Weaver explained the "why do black people eat chicken and watermelon" comment as having a discussion about ethnic foods and "[t]he context of it was to get a broader understanding of where the stereotype, if you will, or that comment is made in regard the Afro-American culture." Dr. Weaver stated that "[plaintiff] said it had something to do with the southern diet." According to Dr. Weaver, plaintiff did not have an adverse reaction to

his question. Dr. Weaver was not called to Human Resources to discuss his conversation with plaintiff until about one year after she had stopped working at the Hospital. (Doc. 34-6, at 6-8).

On August 16, 2012, plaintiff made Padden "aware" that she was upset with some of the "joking around with her and comments being made that are racially insensitive." Specifically, plaintiff explained that she felt that she was being made fun of because of the way she spoke, for example, the way she pronounced word "ask." While Padden was not plaintiff's supervisor, he had responsibility to direct her work. Padden was Stewart's supervisor and he had authority to discipline her. (Doc. 34-4 , at 11). Plaintiff stated that at first Padden laughed and then he asked her if she wanted him to speak to the other workers. Plaintiff informed Padden that she was going to speak to Stewart and to Dr. Weaver herself and that she wanted to resolve this matter on her own. Padden asked plaintiff if she wanted him to be present when she spoke with Stewart and Dr. Weaver, but she told him no. After plaintiff brought her concerns about Stewart's and Dr. Weaver's statements to the attention of management on August 16th, neither one of them said anything else to her that she thought was offensive. (Doc. 34-1, at 42). Also, after plaintiff met with Padden on August 16th, she was not criticized in any way about her work performance.

Later, on August 16, 2012, plaintiff spoke with Stewart in Padden's

office regarding Stewart's comments to her. Plaintiff informed Stewart that she was offended by the comments. Stewart did not deny using the terms "aks" and "birfday." Stewart responded to plaintiff stating that "I don't know why you're offended. You're always teasing." Stewart apologized to plaintiff and then spoke with Padden regarding her conversation with plaintiff. Stewart told Padden that plaintiff was upset since she felt she "was being made fun of about the way she spoke."

At the end of the day on August 16, 2012, Cernera saw plaintiff with a box of items. Cernera had no knowledge of what had happened that day, so Cernera "asked kiddingly if [plaintiff] was moving out." Carol Carroll, a Hospital employee, told Cernera that plaintiff was not happy about something and Cernera then told plaintiff that "if [she] would like to talk later, please call me." According to Cernera, plaintiff responded in her "jokester type of personality" by asking, "what's your number 1-900-Ho?" Plaintiff did not call Cernera and did not complain to Cernera about any harassment during this conversation. (Doc. 34-2, at 9). Plaintiff did not recall ever asking Cernera if her number was "1-900-Ho."

The next day, i.e., August 17, 2012, Padden spoke with his supervisor, Cernera, about his conversation with plaintiff the prior day. During this meeting, Cernera called Lisa Goble, of the Hospital's Human Resources Department, and Goble directed her to "keep an eye on [the situation], see

what happens." (Doc. 34-4, at 11-12; Doc. 34-2, at 9-10). Soon thereafter, plaintiff asked Padden whether he had spoken to Stewart and Dr. Weaver and he replied that "everyone was acting a little weird." Stewart then confronted plaintiff and complained that plaintiff was trying to get her fired. (Doc. 34-1, at 45). Stewart was never disciplined, reprimanded or counseled during her employment with the Hospital, including about her speech and conduct toward plaintiff. (Doc. 34- 5, at 6). Padden admitted that he did not discipline Stewart after August 16, 2012, even though he had authority to do so. (Doc. 34-4, at19).

After receiving Gable's instruction to "keep an eye [on the situation], see what happens", Cernera did not speak with plaintiff or Padden as to whether plaintiff and Padden had a subsequent discussion about the situation. Nor did Cernera speak to anyone else in the department about the matter. (Doc. 34-2, at 10). Cernera has no recollection of any further communication with anyone from Human Resources concerning plaintiff between August 17 and August 27, 2012. (Id.). Further, nobody from Human Resources ever contacted plaintiff after she made her complaints to Padden. (Doc. 34-1 at 82).

Plaintiff stated that after August 16, 2012, "all communications had stopped between [her]self and the [ASC's] nurses." Plaintiff indicated that "the nurses had stopped asking for the information from [her] . . . and they stopped saying hello . . . in the workplace." Plaintiff stated that after multiple such days

she started to write her resignation letter. Plaintiff also contends that her co-workers refused to provide her with documentation in the form of daily schedules necessary to perform her work. Rosengrant acknowledged that the atmosphere of the office changed, it became "very uncomfortable", and people would avoid plaintiff. Rosengrant stated that the nurses and plaintiff's co-workers refused to speak with her from August 20, 2012 to the end of her employment, refused to cooperate with her at work, and failed to provide her with the schedules. (Doc. 34-8, at 8, Doc. 34-1, at 81-82).

In fact, plaintiff stated that after August 16, 2012, Deanne Tomaszewski, an employee of ASC, initially did not provide her with the paper schedule on one day and then completely stopped providing her with paper print outs of the schedules. (Doc. 34-1, at 48-49, 81-82). On the first day in which Tomaszewski did not hand plaintiff a schedule, plaintiff asked her why and she said "she didn't know how I was going to react." Plaintiff did not understand what that response meant. (Doc. 34-1, at 50). As discussed above, plaintiff explained in detail why she required paper print outs of the surgery schedules. Stewart also stated that she delivered paper schedules to the surgical Scheduling Specialists as instructed by Padden and Cernera, and also because the Scheduling Specialists wanted them. Stewart was also required to communicate with plaintiff when passing out copies of the schedules. (Doc. 34-5, at 10- 12). Plaintiff stated that she communicated on

almost a daily basis with Tomaszewski and Drust regarding scheduling changes. (Doc. 34-1, at 78). Padden admitted that he did not discipline Tomaszewski after August 16, 2012, despite having authority to do so.

On August 24, 2012, plaintiff went to Cernera, for the first time, to advise Cernera of her concerns with racially insensitive comments and to make Cernera aware that she was upset with being made fun of by the way she spoke. (Doc. 34-11). Plaintiff testified that she told Cernera that "the words that were said to me; that I was becoming increasingly offended by them." Plaintiff told Cernera that the situation bothered her and that she had spoken to Padden. Plaintiff stated that Cernera told her during the course of their conversation that "her parents still refer to black people as 'colored.'" Plaintiff also asked Cernera if she would lay her off and, she told Cernera that she was going to resign her employment with the Hospital. Cernera told Plaintiff that she would not lay her off because she needed her and, that she wanted plaintiff to continue her employment with the Hospital. Cernera told plaintiff that she would come over to the surgery center so that "we could all, ..., talk about what happened." However, plaintiff stated that "she never showed up." (Id.). Cernera testified that after plaintiff explained the situation, "she was very adamant at attempting to fix it herself." Cernera stated that she offered to do whatever plaintiff would like her to do, but since plaintiff was very good friends with Stewart, plaintiff wanted to fix the situation. (Doc. 34-2, at

11-12).

On August 27, 2012, plaintiff met with Cernera for a second time regarding her concerns. Plaintiff brought her resignation letter to this meeting. During the meeting, plaintiff handed Cernera her resignation letter and told Cernera that she was resigning. Her letter stated that her last day of employment would be September 7, 2012. Since plaintiff informed Cernera of the reason for her resignation in person, Cernera indicated that she did not open the envelope and review plaintiff's letter for several days, until she needed to "process [the] paperwork that goes with it." Plaintiff told Cernera that the reason she was resigning was because she did not feel that Padden had given enough attention to her concerns since he did not come to her and tell her that he had spoken to everyone. Nor did Padden inform plaintiff that he had a "decent conversation with the parties that were involved," and "let everybody know that that's not something that should be taking place in the workplace." Plaintiff also felt that no one took her concerns seriously. (Doc. 34-1, at 51).

Cernera told plaintiff that she did not want her to resign and that she could try and help the situation. Cernera stated that August 27th was the first time plaintiff told her that she intended to resign. Cernera did not want to lose plaintiff since she was a good employee, and she tried to get the staff together to talk about the situation.

In the August 28, 2012 resignation letter to Cernera,(Doc. 34-9), plaintiff stated, in part, as follows:

> This letter is meant to serve as my formal resignation from the company. On August 24th, I sat down and talked to you about a situation that had occurred among some of the staff at the Center for Same Day Surgery. The original incident occurred on August 16th, which is when I first brought it to the attention of Mike Padden. It has occurred to me that this situation has greatly spiraled out of control (unnecessarily) and I feel that there were no efforts put into rectifying the matter. Since the original incident, some staff members have stopped communicating with me even within the capacity of normal job duties. I have been accused of saying things that I did not say and basically I have been made to feel out casted by several employees. The workplace has become a very uneasy and emotionally stressful environment. This situation is affecting my work performance and compromising my emotional stability.

Cernera spoke with the staff and plaintiff on August 29, 2012, in Padden's office about plaintiff's resignation since this was the first chance when they were all available. Cernera started to speak with Stewart, Marigrace Drust and Tomaszewski stating that she "wanted us all to get together to talk so we can reconcile this", and they left the door open waiting for plaintiff to arrive. Cernera stated that in close proximity thereafter, i.e., 30 seconds to one minute later, plaintiff arrived after finishing a task. Cernera stated that plaintiff was a part of the entire meeting and that there was not a separate part of the meeting without plaintiff. However, Rosengrant stated that

Cernera met with Stewart, Tomaszewski and Drust for about 20 minutes before plaintiff was called in the meeting. (Doc. 34-8, at 10).

During the meeting, the staff repeatedly stated that they did not want plaintiff to resign. The staff mentioned to Cernera that the type of kidding that ended up offending plaintiff was common every day and that plaintiff also made similar comments. It was Cernera's understanding that "they all really got along very well and they busted back and forth." Plaintiff spoke during the meeting. Tomaszewski explained why she did not give plaintiff a schedule on the one day stating that sometimes she was scrubbed in an operating room for a very long time and some days they do not have the opportunity to even come out to the office. When plaintiff stated that it was too late to rectify the situation and she still wanted to resign, Cernera and the staff were still all together. (Doc. 34-2, at 12-16).

During the meeting, plaintiff stated that "the nurses were saying, oh, we heard you were leaving, you know, we're sorry, we didn't mean for you to leave or we didn't mean for this to happen. And that's when I asked Deanne [Tomaszewski] about, you know, not speaking to me and not giving me a schedule, and that's when she said she didn't know how I would react." Plaintiff did not accept Tomaszewski's explanation since she had gotten a

schedule from her on every other day. Tomaszewski and Drust apologized to plaintiff at the meeting but plaintiff does not recall if Stewart apologized to her. In fact, Stewart did not testify that she apologized to plaintiff at the meeting and did not speak to plaintiff again after the meeting even though Stewart conceded that she was required to communicate with plaintiff in the course of distributing schedules. (Doc. 34-1, at 56-58).

Plaintiff was not satisfied with the meeting since she could not bring up all the things that had offended her, and since she was not allowed by Cernera to speak much more than what she said to Tomaszewski about the schedule. Specifically, Cernera told plaintiff "we're not here to ask so many questions. Don't ask questions." (Doc. 34-1, at 56-58). Cernera later testified Tomaszewski said that she did not give plaintiff printed schedules because some days they were busy. (Doc. 34-2, at 14). Cernera also reported that Tomaszewski indicated that plaintiff always said she did not want a schedule. Plaintiff stated that she did not tell Tomaszewski she did not want schedules. (Doc. 34-1, at 81).

After the meeting, plaintiff decided she could not return to work despite the fact that she was scheduled to work through September 7, 2012. (Doc. 34-14, at 8). Plaintiff went to her desk and cried because she was not a part

of the whole meeting, and she felt like she was left in the dark about what possibly was said before she entered the room. Plaintiff was also upset since Cernera advised her to sweep everything under a rug and act like it never happened. In particular, toward the conclusion of the meeting, plaintiff asked Cernera "are you telling me that I should act like this never happened, and she shook her head yes." This made plaintiff "feel like everything that happened wasn't important, nothing was going to be done about it. It upset me even more and it made me feel like I didn't want to continue my employment there." (Doc. 34-1, at 56-58, 83-84).

Following the August 29, 2012 meeting, most days plaintiff would be crying at work. Rosengrant observed plaintiff crying at work at least four or five times after plaintiff's complaints. When Rosengrant saw plaintiff crying, she asked the reason and plaintiff told her "It was becoming very difficult to be at work. All of sudden [plaintiff] felt like she had all these people who didn't like her and they wouldn't talk to her, it just became a very difficult work environment." Plaintiff told Rosengrant that she was even more upset because nothing happened after she complained. However, Rosengrant stated that after the meeting she did not hear any other comments being made to plaintiff about her race. When Rosengrant resigned her 23-year

employment with the Hospital shortly after plaintiff left, Cernera asked if her resignation was because of plaintiff and she said “no.” During her deposition, Rosengrant stated that what occurred with plaintiff “was a big influence” in her resignation but she did not tell this to Cernera. Rosengrant also testified that it was no longer comfortable working for the Hospital and that it had “[a] lot to do with all that had transpired with [plaintiff].” (Doc. 34-8, at 10-11, 14-15).

After plaintiff resigned, the Hospital did not replace her with any employee. Robin Kessler (Caucasian) was a Scheduling Specialist and performed plaintiff’s duties during the seven-week period: November 5, 2012 to December 29, 2012. On December 30, 2012, Kessler was transferred and became the secretary/scheduler for the ASC. Kessler did not receive a salary increase after her transfer to the new position. (Doc. 34-13, at 7, Doc. 34-4, at 55-6). Plaintiff’s position was not filled to date.

The Hospital maintains a Code of Conduct setting forth a procedure for individuals to report alleged racial harassment, namely by contacting the HR Department, the facility Ethics and Compliance Officer (ECO), the Corporate Compliance and Privacy Officer, or the Confidential Disclosure Program. Plaintiff received, read and understood the Hospital’s Employee Code of Conduct. On June 25, 2009, she executed an Acknowledgment to the Code

of Conduct. After plaintiff spoke with Padden and Cernera and made them aware that she was offended by some comments that were made to her, neither one of them told her that she had to follow procedures contained in the Employee Handbook and neither one told her that she had to follow other protocols. Nor did Padden and Cernera provide plaintiff with contact information for any of the personnel identified in the Code of Conduct. (Doc. 34-14, Doc. 34-15, Doc. 34-1, at 79-80, Doc. 34-16).

Padden admitted that he had a responsibility to report to the authorities identified in the Code of Conduct what plaintiff had told him about the racial comments directed to her and, that he did not report these to the authorities. Padden explained that the reason he failed to report the matter was that this was the first time he "was encountering a situation like this." Padden did state that plaintiff was aware of reporting requirements of the Hospital since she had annual training on such matters which he conducted. (Doc. 34-4, at 8-9). Additionally, Cernera admitted that it is Hospital policy to report claims of harassment to Human Resources, as she did regarding plaintiff, even if the reporting employee requests otherwise, in order to protect the employees. (Doc. 34-2 at 17).

Specifically, Cernera and Padden contacted Goble at Human

Resources before plaintiff's notice of resignation. When Cernera reported plaintiff's complaints to Goble, she was only advised to keep an eye on the situation. At no time did Padden ask Rosengrant about plaintiff's complaints and Rosengrant was never interviewed by Goble or by anyone from Hospital management regarding plaintiff. (Doc. 34-8, 8-9, 14).

The Employee Code of Conduct, (Doc. 34-15, at 9), provided in pertinent part:

> Every employee has a right to a work environment free of harassment or discrimination because of gender, age, race, ethnicity, religion, creed, national origin, sexual orientation or any other attribute or characteristic protected under federal or state law. All colleagues shall treat one another with courtesy, fairness, and respect. We will not tolerate any sexual, racial, ethnic, religious, or other forms of harassment of colleagues or applicants. The organization will take action to fairly and objectively address any complaints of harassment or inappropriate behavior. If you experience or witness such behavior, contact the facility Human Resources Department, the facility Ethics and Compliance Officer (ECO), the Corporate Compliance and Privacy Officer, or the Confidential Disclosure Program.

Plaintiff contacted Human Resources regarding the alleged harassment on the last day she worked for the Hospital, i.e., August 29, 2012. (Doc. 34-1, at 89, 106-109).

Plaintiff did not contact the Hospital's facility Ethics and Compliance Officer (ECO) regarding her allegations of harassment. Nor did plaintiff call

the Hospital's Corporate Compliance Line about the alleged harassment. Further, plaintiff did not participate in the Confidential Disclosure Program regarding the alleged harassing comments.

Plaintiff or her sister, with plaintiff's permission, created a Facebook page entitled "You know yo ass is from da hood when…". Plaintiff consented to her participation in the social media postings on Facebook that she viewed and made. Copies of plaintiff's Facebook page have been submitted as exhibits. (Doc. 34-17). Plaintiff testified that she did not find it offensive when people who were her "peers" made jokes and comments about racial stereotypes regarding African-Americans, and it was okay for her "peers" to make the racial comments on her Facebook page. Plaintiff further testified her "peers" were individuals who she knew personally and who she "grew up with, in the same neighborhood, went to school with." However, plaintiff stated that it would be offensive if someone who was not her "peer" made such comments. Plaintiff did not know personally many of the individuals whose posts she "liked" or "commented" on in her Facebook page.

As noted later, the comments stated on plaintiff's postings, including the comments made by other individuals, need not be detailed herein. Nor need any conclusions be drawn regarding the postings in deciding this motion for summary judgement.

It should also be noted that plaintiff's co-workers at the Hospital were

not aware of any Facebook postings made or permitted by plaintiff.

## III. STANDARD OF REVIEW

The defendant's motion for summary judgment is brought pursuant to the provisions of Fed.R.Civ.P. 56. Defendant argues that under Rule 56, the undisputed material facts demonstrate that it is entitled to summary judgment with respect to all of the counts of plaintiff's complaint. "In an employment discrimination case, the burden of persuasion on summary judgment remains 'unalterably with the employer as movant.'" Syed v. YWCA, 906 F.Supp.2d 345, 353 (M.D.Pa. 2012) (quoting Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 362 (3d Cir. 2008)).

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp.

836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). The nonmoving party "may not rest on the allegations set forth in its pleadings but must counter with

evidence that demonstrates a genuine issue of fact." Big Apple BMW, 974 F.2d at 1363. However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

Additionally, a "party cannot rely upon self-serving conclusions, unsupported by specific facts in the record." LaResca v. AT & T, 161 F.Supp.2d 323, 327 (D.N.J. 2001) (citing Celotex, 477 U.S. at 322–23, 106 S.Ct. 2548). An affidavit in opposition to a motion for summary judgment that is conclusory and lacking in specific facts is inadequate to meet the non-movant's burden. Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002) (citing Maldonado v. Ramirez, 757 F.2d 48, 50 (3d Cir. 1985)).

## IV. DISCUSSION

The court has jurisdiction with respect to plaintiff's Title VII claims pursuant to 28 U.S.C. §1331. *Page v. Trustees of Univ. of Pennsylvania*, 222 Fed. Appx. 144, 145 n. 1 (3d Cir. 2007). The Court may exercise pendent jurisdiction over plaintiff's state law PHRA claims pursuant to 28 U.S.C.

§1367. *Slater v. Susquehanna Co.*, 613 F. Supp. 2d 653, 657 (M.D. Pa. 2009).

As mentioned, in Counts I, II and V, plaintiff raises claims of race discrimination under Title VII, §1981 and under §955(a) of the PHRA, respectively. In Counts III, IV and VI, plaintiff raises retaliation claims under Title VII, §1981 and under §955(d) of the PHRA, respectively. Further, in Counts VII, VIII (mislabeled as Count VII) and IX plaintiff raises claims of racial harassment under Title VII, §1981 and under §955(a) of the PHRA, respectively.[3] WBHC seeks summary judgment with respect to all of plaintiff's

---

[3]The court notes that the analysis of plaintiff's Title VII race discrimination claims applies equally to her PHRA and §1981 claims. *See Rozic v.Trinity Industries, Inc.*, 47 Fed. Appx. 151, 152 (3d Cir. 2002); *Davis v. Tammac Corp*. 127 F. Supp. 2d 625, 629 n. 6 (M.D. Pa. 2000) ("Claims brought under the PHRA are analyzed under the same standards as their federal counterparts.") (citations omitted); *Thimons v. PNC Bank, N.A.*, 254 Fed. Appx. 896, 897 n. 1 (3d Cir. 2007). "A claim under §1981 generally requires the same elements of proof as an employment discrimination claim under Title VII, but 'is limited to issues of racial discrimination in the making and enforcing of contracts.'" Deans v. Kennedy House, Inc., 998 F.Supp.2d 393, 414 (E.D.P.a 2014) (citations omitted); Booker v. National R.R. Passenger Corp., 880 F.Supp.2d 575, 580 (E.D.Pa. 2012) ("[T]he substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII.") (quoting Brown v. J. Kaz, Inc., 581 F.3d 175, 182 (3d Cir.2009)). See also Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (race and gender discrimination claims under Title VII, section 1981, and the PHRA are analyzed together for summary judgment purposes).

The court also notes that employment discrimination and harassment claims under Title VII, the PHRA, and §1981 are subject to the same test.

(continued...)

claims. Plaintiff argues that there are genuine issues of material fact in dispute for each of her claims precluding summary judgment for WBHC.

In Howard v. Blalock Elec. Service, Inc., 742 F.Supp.2d 681, 689-90 (W.D.Pa. 2010), the court explained:

> Title VII's anti-discrimination provision provides that it is an "unlawful employment practice" for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. §§2000e–2(a)(1). In Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 63–69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the United States Supreme Court recognized that an employer discriminates against an employee because of his or her sex when it engages in sex-based harassment that is sufficiently "severe or pervasive" to alter the "terms, conditions, or privileges" of his or her employment. The holding in Meritor Savings Bank applies with equal force to harassment based on an individual's race, color, religion or national origin. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276, n. 5 (3d Cir. 2001). Harassment which does not alter the "terms, conditions, or privileges" of one's employment, however reprehensible it may be, does not run afoul of Title VII. Meritor Savings Bank, 477 U.S. at 67, 106 S.Ct. 2399. An isolated incident amounts to a change in the "terms, conditions, or privileges" of one's employment only if it is "extremely serious." Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Title VII's anti-discrimination provision prohibits only those forms of discriminatory harassment that are severe or pervasive enough to create a hostile or abusive working environment. Fn3 Pennsylvania State Police v. Suders, 542 U.S. 129, 146–147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

---

(...continued)
Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104, n.2 (3d Cir. 2009); Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 267 (3d Cir. 2010).

FN3. Race-based “hostile work environment” claims are cognizable under §1981, since harassment that is severe enough to alter the “terms, conditions, or privileges” of one's employment within the meaning of Title VII is also severe enough to affect the “benefits, privileges, terms, and conditions of the contractual relationship” between the employee and his or her employer within the meaning of §1981. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 373, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004).

“The scope of protection provided by Title VII includes protection against a hostile work environment that is abusive to an employee on the basis of his or her race.” Mufti v. Aarsand & Co., Inc., 667 F.Supp.2d 535, 544 (W.D.Pa. 2009) (citing Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001)).

***1. Racially Hostile Work Environment Claims***

Initially, WBHC argues that plaintiff failed to produce enough evidence to prove she was subjected to a racially hostile work environment and that she was subjected to severe or pervasive harassment due to her race. In order for an employee to establish a claim of racial harassment, the court in Taylor v. JFC Staffing Assoc., 690 F.Supp.2d 357, 367-68 (M.D.Pa. 2009), stated that the plaintiff must show the following five elements:

> (1) [plaintiff] suffered intentional harassment based on race; (2) the harassment was severe or pervasive; [fn 4]; (3) the harassment detrimentally affected [plaintiff]; (4) the harassment would have detrimentally affected a reasonable person in like circumstances; and (5) there is a basis for employer liability [for the harassment under a theory of respondeat superior liability].

Fn4. The Third Circuit has often stated that discriminatory harassment must be "severe and pervasive." See e.g., Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); West v. Phila. Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995); Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990). But the Supreme Court's standard is "severe or pervasive." Pa. State Police v. Suders, 542 U.S. 129, 133, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). As the Third Circuit recognized in Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), "the difference is meaningful, and the Supreme Court's word controls." Id. at n. 3. By using the disjunctive "or" the Supreme Court clearly meant that "severe" and "pervasive" are alternative possibilities. In other words, some conduct, although isolated and sporadic, may be severe enough to contaminate the workplace; whereas, other, less objectionable, conduct must be pervasive in order to contaminate the workplace such that it meets the threshold under the second prong of a hostile work environment claim.

"When a workplace is so permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [a] victim's employment and create an abusive working environment, Title VII is violated." Oncale v. Sundowner Offshore Srvs., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

The same standards apply to hostile work environment claims under Title VII and the PHRA based on race discrimination with the word "discrimination" substituted for the word "harassment" in elements 1-4 stated above. See Mufti v. Aarsand & Co., Inc., 667 F.Supp.2d 535, 544 (W.D.Pa. 2009) (citations omitted). Thus, to prove a hostile work environment claim under Title VII, plaintiff must show that: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or

pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for vicarious liability. Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009).

"[A] court's hostile work environment analysis 'must concentrate not on individual incidents, but on the overall scenario' because it is often difficult to determine the motivation behind allegedly discriminatory actions." Syed, 906 F.Supp.2d at 355 (citation omitted). "In assessing the evidence presented, [the court] must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is ... relevant.... But while psychological harm ... may be taken into account, no single factor is required.'" Miller v. Thomas Jefferson Hosp., 565 F.3d 88, 93 (3d Cir. 2014) (citation omitted).

In viewing the facts of record and all reasonable inferences derived therefrom, in the light most favorable to plaintiff, the court finds that plaintiff has produced enough evidence to create a genuine issue of material fact for a jury to resolve. As outlined above, plaintiff has submitted enough evidence

from which a reasonable factfinder could infer that the incidents of verbal harassment at the Hospital were motivated by racial animus. The mocking and comments made to plaintiff were related to and motivated by her African American origin, including the way in which she pronounced certain words. Thus, there is sufficient evidence in the above stated record to show that genuine disputes of material fact exist as to whether plaintiff suffered intentional harassment or discrimination from her co-workers at the Hospital.

"Employer liability for a racially hostile work environment caused by an employee is not automatic." Taylor, 690 F.Supp.2d at 368 (citation omitted). The agency theory upon which plaintiff in the present case relies to hold defendant WBHC liable for a racially hostile work environment is "where an employer was negligent in its failure to discipline or fire, or failure to take remedial action upon notice of harassment. Knabe [v. Boury, 114 F.3d 407], 411 [3d Cir. 1997] (citing Bouton, 29 F.3d at 106)." Id. As such, defendant WBHC can be held liable for the conduct of its employees, such as Stewart and Weaver, if it "was negligent in failing to take the appropriate remedial action upon notice of the harassment." Id. "[A]n employer is vicariously liable to a plaintiff for a hostile environment created by a supervisor with immediate authority over the plaintiff that results in a tangible employment action such as discharge, demotion, or undesirable reassignment." Syed, 906 F.Supp.2d at 358 (citing Faragher, 524 U.S. at 807–08). Additionally, Plaintiff can

establish employer liability based on her alleged constructive discharge. Id.

Plaintiff produced enough evidence to show that defendant WBHC knew or should have known of the racial harassment in the workplace and failed to take prompt remedial action. Plaintiff indicated that when she complained to Padden on August 16, 2012, this was a culmination of enduring the racially insensitive comments and mocking by her co-workers over a lengthy period of time on a weekly basis. It is also undisputed that Stewart was never disciplined for her comments to plaintiff even after plaintiff complained to Padden and Cernera. Dr. Weaver was not even questioned about his comments to plaintiff until one year after she left the Hospital. Plaintiff did not find the meeting with Cernera and her co-workers resolved her concerns and she contends that she was not allowed to ask her questions. Plaintiff was not told by either Padden or Cernera that she had to further pursue her complaints under the Code of Conduct. Plaintiff's evidence suffices to demonstrate that the conduct at issue occurred on a regular basis over a significant period of time, that management of the Hospital should have been aware of the conduct long before August 16, and that the Hospital failed to take appropriate timely action. Plaintiff has also produced evidence to show that insufficient remedial action was taken by supervisory personnel, namely, Padden and Cernera, after plaintiff put them on notice of the racial harassment. Thus, there is sufficient evidence, at this stage of the

proceedings, for liability to be imputed to defendant WBHC for the co-workers harassment in this case. Mufti v. Aarsand & Co., Inc., 667 F.Supp.2d at 545-46.

Further, the conduct "must be extreme to amount to a change in the terms and conditions of employment." *Faragher City of Boca Raton,* 524 U.S. 775, 787-88 (1998). Isolated and sporadic racial comments will not amount to discriminatory changes in the conditions of employment. See *Faragher City of Boca Raton,* 524 U.S. at 788). "The test looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it interferes with an employee's work performance." Mufti v. Aarsand & Co., Inc., 667 F.Supp.2d at 545. (Citations omitted).

Based on the evidence and the facts detailed above, viewed in a light favorable to plaintiff under the totality of the circumstances, as well as the alleged frequency of the discriminatory conduct, its severity, the humiliation caused to plaintiff, and the interference it caused with plaintiff's work performance, plaintiff has presented sufficient evidence that a hostile work environment may have existed at the Hospital. Stewart repeatedly mimicked the way plaintiff pronounced certain words at least weekly according to plaintiff. Stewart's continual conduct coupled with Dr. Weaver's question and comment mocking plaintiff's pronunciation was sufficiently pervasive. The

testimonies of plaintiff and Rosengrant are sufficient to allege that the harassment was motivated by plaintiff's race. See Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 269 (3d Cir. 2010) (court looks to see if the conduct is "so revealing of discriminatory animus that it would enable a factfinder to conclude that a discriminatory attitude was, more likely than not, a motivating factor in the decision...."); see also Mufti v. Aarsand & Co., Inc., 667 F.Supp.2d at 545 ("[T]he intent to discriminate can be inferred from the entire context and the conduct of the actors involved."). There is enough evidence to find that the repeated comments over an extended period of time together with the questions and behavior went beyond simple teasing, and that the workplace became a hostile work environment.

Plaintiff has also demonstrated that the comments and behavior detrimentally affected her and unreasonably interfered with her work performance. The disputed evidence that plaintiff also frequently made racial comments and jokes more appropriately may relate to her credibility. "'Title VII does not have a corroboration requirement' and, therefore, the granting of summary judgment in a Title VII case cannot turn on a credibility determination because such determinations are for the finder of fact." Syed, 906 F.Supp.2d at 354 (quoting Durham Life Ins. v. Evans, 166 F.3d 139, 147 (3d Cir. 1999)). Additionally, plaintiff eventually complained to management and she complained on Facebook about the conduct that was making her

upset. The conduct was severe enough to allegedly cause plaintiff to cry on several days and created an uncomfortable atmosphere in the office. Ms. Rosengrant also noted how the conduct had crossed the line. Rosengrant stated that plaintiff's co-workers frequently made "fun of the way she said certain words that ...was pretty much due to her race" and, that the humor of her co-workers was "about [plaintiff's] race a lot." Rosengrant stated that the manner race was used in a lot of jokes regarding plaintiff was offensive and made her uncomfortable. Rosengrant added that "[t]hey were seemingly little things, but I think all together they kind of were a pattern of being very focused on [plaintiff's] race." (Doc. 34-8, at 4-6, 14).

Based upon the record, there is enough evidence to show how the conduct unreasonably interfered with plaintiff's work performance. Further, the repeated comments directed at plaintiff's manner of pronouncing certain words could detrimentally affect a reasonable person of the same race as plaintiff. See Syed, supra. Considering the totality of the circumstances, the court finds that the conduct in question appears pervasive and regular enough to allow plaintiff's hostile work environment claims to proceed to trial. Plaintiff also has produced sufficient evidence to show that the repeated comments and continual mocking by her co-workers made her more than simply upset and, and that this conduct would have detrimentally affected a reasonable person in like circumstances. Further, there is enough evidence to show that

the repeated incidents could amount to discriminatory changes in the "terms and conditions of employment." Faragher, 524 U.S. at 788.

Thus, the court will deny defendant's summary judgment motion with respect to plaintiff's hostile work environment claims.

### *2. Constructive Discharge Claims*

Defendant also argues that plaintiff has failed to establish her constructive discharge claim since her working conditions were not so intolerable that a reasonable person would have felt compelled to resign. Even though plaintiff resigned her position with the Hospital, she argues that her resignation constitutes a constructive discharge. "An employer may be liable for constructive discharge under Title VII." Mufti v. Aarsand & Co., Inc., 667 F.Supp.2d at 553 (citing Pennsylvania State Police v. Suders, 542 U.S. 129, 143, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)".

"In *Suders*, the Supreme Court stated that a hostile-environment constructive discharge claim 'entails something more' than a hostile work environment claim, as it also requires the claimant to show 'working conditions so intolerable that a reasonable person would have felt compelled to resign.'" Id. (citing Suders, 542 U.S. at 147, 124 S.Ct. 2342). The court "employ[s] an objective test to determine whether an employee can recover on a claim of constructive discharge." Duffy v. Paper Magic Group, Inc., 265

F.3d 163, 167 (3d Cir. 2001) (citation omitted). "Specifically, a court must determine 'whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign.'" Id. (citation omitted). Also, there must be causation between the occurrence of the discriminatory conduct and the employee's resignation. Syed, 906 F.Supp.2d at 359.

Plaintiff contends that she was forced to resign and that she had no choice because the workplace became a very uneasy and emotionally stressful environment which was affecting her work performance and compromising her emotional stability. "[The court] will find a 'constructive' termination where an employer knowingly permitted conditions of discrimination so unpleasant that a reasonable person would have felt compelled to resign." Barnett v. N.J. Transit Corp., 573 Fed.Appx. 239, 244 (3d Cir. 2014) (citation omitted). "An employee is protected under federal anti-discrimination laws 'from a calculated effort to pressure her into resignation through the imposition of unreasonably harsh conditions.'" Id. (citing Connors v. Chrysler Financial Corp., 160 F.3d 971, 975 (3d Cir. 1998).

Plaintiff's evidence shows several incidents of racial comments and insensitive conduct over a period of time to establish the "intolerable conditions" and "unbearable" workplace she must prove for a constructive termination. While plaintiff first complained to management on August 16,

2012, there is evidence that the racially insensitive comments and conduct had been occurring for some time on a weekly basis and that plaintiff's complaint to Padden was the culmination of the allegedly intolerable work conditions and not the beginning of them. In fact, plaintiff's evidence revealed that she was mocked on a regular basis, i.e., at least a weekly basis, through August 2012. Plaintiff stated that she was offended by Stewart's mocking and objected to it, but it continued. The evidence detailed above is sufficient to show that a reasonable person could have been compelled to resign. The facts discussed above show that plaintiff has sufficiently established "the imposition of unreasonably harsh conditions" at the Hospital causing her to resign. In fact, the work atmosphere became so uncomfortable, that even Rosengrant resigned shortly after the plaintiff left. Rosengrant stated that what occurred with plaintiff "was a big influence" in her decision to resign from the Hospital. As such, plaintiff has met the more stringent requirements regarding her constructive discharge claims based on continual racial harassment.

Thus, the court will deny defendant's summary judgment motion with respect to plaintiff's constructive discharge claims.

***3. Retaliation Claims***

In order to properly plead a retaliation claim in violation of Title VII, a plaintiff must prove a *prima facie* case by providing facts showing that: (1) she was engaged in a protected activity; (2) she has suffered an adverse employment action based on exercise of the protected activity; and (3) there is a causal link between the protected activity and the adverse employment action. *Hussein v. UPMC Mercy Hospital*, 466 Fed. Appx. 108, 111-12 (3d Cir. 2012) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006)); *Farrell v. Planters Lifesavers Company*, 206 F.3d 271, 279 (3d Cir. 2000). Further, plaintiff must show a causal connection between her participation in a protected activity and the adverse employment action. *Thomas v. Pocono Mtn. Sch. Dist.*, 2011 WL 2471532, *8 (M.D.Pa. June 21, 2011). "Causation 'may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Id.* (citation omitted).

In *Mufti*, 667 F.Supp.2d at 552, the court stated:

> A plaintiff must participate in a protected activity to establish a retaliation claim. See Barber v. CSX Distribution Services, 68 F.3d 694, 700–701 (3d Cir. 1995) (finding a general letter of complaint that did not mention discrimination was not a protected activity). Protected activity includes formal charges of discrimination "as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." See e.g., Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990).

> However, to constitute "protected activity," the employee must also have a "good faith, reasonable belief that a violation existed." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996).

To satisfy the third, "material adversity," element of a retaliation claim, plaintiff must prove that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hare v. Potter,* 220 Fed.Appx. 120, 128 (3d Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006)).

Further, "Title VII's anti-retaliation provisions [42 U.S.C. §2000e-3] protect employees who oppose employment practices made illegal by Title VII." *Brangman v. Astrazeneca,* LP, 952 F.Supp.2d 710, 721 (E.D.Pa. 2013) (citation omitted). "The Plaintiff must therefore be opposing employment practices made illegal by Title VII." *Id*. (citation omitted). Also, "case law has established that opposition to an illegal employment practice must identify the employer and the practice – if not specifically, at least by context." *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc*., 450 F.3d 130, 135 (3d Cir. 2006). Moreover, "[a] general complaint of unfair treatment is insufficient to establish protected activity under Tile VII." *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc*., 450 F.3d at 135 (citations omitted). "[T]o succeed on a Title VII retaliation claim, an employee must have an 'objectively reasonable' belief that the activity he opposes constitutes

unlawful discrimination under Title VII." *Ferra v. Potter*, 324 Fed.Appx. 189, 192 (3d Cir. 2009) (citation omitted). Thus, in order for plaintiff's complaints about her treatment by her co-workers to constitute protected activity under Title VII, a reasonable person must believe that the conduct complained of violated Title VII. *Id.* (citation omitted); *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995) (complaints about unfair treatment in general and expressions of dissatisfaction in the workplace "do[] not constitute the requisite 'protected conduct' for a *prima facie* case of retaliation.").

In *Hussein*, 466 Fed. Appx. at 112., the Third Circuit stated the following about the PHRA in relation to Title VII:

> The PHRA, which we generally interpret consistently with Title VII, likewise forbids employers from retaliating against employees for asserting their rights under the PHRA. See *Fogleman v. Mercy Hosp.*, 283 F.3d 561, 567 (3d Cir. 2002)("The language of the PHRA is . . . substantially similar to [Title VII and other federal] anti-retaliation provisions, and we have held that the PHRA is to be [] interpreted as identical to federal anti-discrimination laws except where there is something specifically different . . . .") (citing *Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996)).

Therefore, the court analyzes plaintiff's Title VII retaliation claim and her PHRA retaliation claim under the aforementioned Title VII retaliation *prima facie* requirements.

In examining the above detailed facts of record, the court finds that plaintiff has produced enough evidence to support the elements necessary to successfully establish a *prima facie* retaliation claim under both Title VII and

the PHRA. Plaintiff states that when she made complaints to supervisors about racial harassment by her co-workers, the conditions of her workplace were made intolerable by her co-workers, including their refusal to speak to her, their shunning and ignoring of her, and their refusal to provide her with the necessary documents (*i.e.*, paper copies of the surgery schedules) to perform her job. Thus, as plaintiff argues, she has not only shown that she was ignored at work and treated as an outcast after her complaint to Padden on August 16, 2012, and subsequent complaint to Cernera, but she has also shown that her co-workers deliberately interfered with her work by no longer giving her paper copies of the operating room schedules.

There a genuine factual disputes as to whether plaintiff required the paper copies of the schedules to properly perform her job. Plaintiff testified at length about how she previously was given paper copies of the schedules and as to why she needed these paper copies. In fact, plaintiff stated that prior to her complaint to Padden, her co-workers provided her with paper copies of the schedules on a daily basis. She also stated that after her complaints to management she no longer received the paper copies on several occasions. Rosengrant witnessed how the co-workers began to deliberately pass by plaintiff's work station when they were handing out the copies of the schedules to the other workers. There are also factual disputes as to why plaintiff was no longer receiving copies of the paper schedules and how many

times this occurred. When plaintiff complained to Padden on August 22, 2012, that her co-workers were not speaking to her and no longer giving her copies of the schedules, he merely responded that "basically, everyone seems a little weird right now." When the conduct of her co-workers continued, plaintiff went to Cernera on August 24, 2012, and complained about the verbal, racial harassment she had been subjected to, as well as the fact that her co-employees were no longer speaking to her at work, nor cooperating with her in their work. Cernera's response was that she could not identify with plaintiff because she was not black herself and told plaintiff that her own mother still refers to black people as being "colored." Also, in the days following her complaints, plaintiff cried at her desk and Rosengrant observed her crying.

Plaintiff has also established an adverse employment action since she has sufficiently shown that she was constructively discharged from her job with the Hospital, as discussed above. The court also finds that an objectively reasonable person could believe that the remarks made by Stewart, which according to plaintiff occurred on a weekly basis through August of 2012, and by Weaver, as well as the other incidents complained about, constitute unlawful discrimination. (Doc. 36, at 14-18).

Therefore, the court will deny defendant's motion for summary judgment with respect to plaintiff's retaliation claims.

## V. CONCLUSION

Accordingly, the court will **DENY** defendant's motion for summary judgment, (Doc. 33), with respect to all of plaintiff's claims. An appropriate order will follow.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATED: November 17, 2015**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-1062-02.wpd