**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANEESHA BRYANT,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:14-1062** |
| **v** | : | **(JUDGE MANNION)** |
| **WILKES-BARRE HOSPITAL COMPANY, LLC,** | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Presently before the court in this race discrimination in employment, hostile work environment, and retaliation action are six opposed motions in limine. One motion was filed by plaintiff Aneesha Bryant, (Doc. 59), and five motions were filed by defendant Wilkes-Barre Hospital Company, LLC. (Doc. 61, Doc. 63, Doc. 65, Doc. 67, Doc. 78). For the following reasons, the motions in limine are **GRANTED IN PART** and **DENIED IN PART**.

Plaintiff, an African-American, instituted this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*., the Civil Rights Act of 1870, 42 U.S.C. §1981, as well as the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §955. She raised claims of racial discrimination, racial harassment and retaliation under Title VII, §1981 and the PHRA regarding her August 2012 resignation from her job as an Operating Room Scheduling Specialist with Wilkes-Barre General Hospital

("the Hospital").[1] Plaintiff alleges that her co-workers made racial comments and jokes about her in the work place. For example, plaintiff claimed that on several occasions a co-worker asked her why she always says "aks", "birfday" and "bafroom". Plaintiff alleges despite objecting to the teasing and informing co-workers she was offended by it, it continued. Plaintiff alleges that after she complained to supervisors other employees stopped speaking to her and refused to provide her with documentation necessary to perform her work. Plaintiff also alleges that she was subjected to a hostile work environment after her complaints. Plaintiff eventually resigned her position with the Hospital claiming she was constructively discharged.

The trial in this case is scheduled to commence on July 11, 2016.

Plaintiff moves to preclude the Hospital from presenting any evidence concerning her participation in a Facebook group entitled "You know ya ass is from da hood when". (Doc. 59). Plaintiff contends that such testimony is irrelevant, unfairly prejudicial and confusing and, that it is inadmissible under Fed.R.Evid. 402.

For its part, the Defendant moves to preclude plaintiff and her counsel from making any argument or reference to Community Health Systems' acquisition of an ownership interest in the Hospital. (Doc. 61). The Hospital

---

[1]The court does not repeat the full background of this case since it is thoroughly discussed in the November 17, 2015 memorandum, (Doc. 43), denying defendant's motion for summary judgment. *See* Bryant, 2015 WL 7252466 (M.D.Pa. Nov. 17, 2015), –F.Supp.3d–.

contends that any such reference is irrelevant to this case and should be excluded under Fed.R.Evid. 401.

Second, the Hospital moves to preclude plaintiff from introducing Wyoming Valley Health Care System Department of Professional Development Pharmacology Review and Workbook for R.N.'s/G.N.'s ("the Pharmacology Workbook") into evidence. (Doc. 63). The Hospital argues that any evidence concerning the Pharmacology Workbook should be excluded under Federal Rules of Evidence 401, 402 and 403 as well as 901(a) since plaintiff had no recollection of ever seeing this workbook and none of the witnesses deposed had any familiarity with it.

Third, the Hospital moves to preclude Helen Rosengrant from testifying or making any reference to her feelings regarding the statements she claims she overheard and the behavior described by plaintiff, as irrelevant. (Doc. 65).

Fourth, the Hospital moves to preclude Rosengrant from introducing testimony or making any reference to the reasons for her resignation from the Hospital. (Doc. 67).

Fifth, the Hospital seeks to exclude plaintiff from presenting five recently identified witnesses at trial who seemingly have knowledge of the Pharmacology Workbook. (Doc. 78).

Plaintiff filed a brief in support of her motion. (Doc.60). The Hospital also has briefed its motions, with exhibits. (Doc. 62, Doc. 64, Doc. 66, Doc. 68, (Doc. 79, Doc. 83). The Hospital filed its brief in opposition to plaintiff's

3

motion, with exhibits, on June 3, 2016. (Doc. 74). Plaintiff filed her briefs in opposition to all five of the Hospital's motions with exhibits aa well. (Doc. 70, Doc. 71, Doc. 72, Doc. 73, Doc. 81, Doc. 82).

The motions presently at issue seek, in part, to exclude evidence as irrelevant. It is axiomatic that "irrelevant evidence is not admissible." Fed.R.Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the action." Fed.R.Evid. 401. According to the Third Circuit, "Rule 401 does not raise a high standard." Hurley v. Atl. City Police Dep't, 174 F.3d 95, 109–10 (3d Cir. 1999) (citation omitted). Even if evidence is relevant, the court can exclude it if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403. Unfair prejudice is prejudice which "cloud[s] impartial scrutiny and reasoned evaluation of the facts, which inhibit[s] neutral application of principles of law to the facts as found." Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 670 (3d Cir. 2002) (citations omitted). "Prejudice does not simply mean damage to the opponent's cause." Id.

The court will now address the motions in limine seriatim.

Plaintiff filed a motion in limine to preclude the Hospital from presenting any evidence regarding her Facebook page. (Doc. 59). On August 1, 2011,

plaintiff or her sister, with plaintiff's approval, created a Facebook page entitled "You know yo ass is from da hood when". Plaintiff consented to her participation in the social media postings on Facebook that she viewed and made. Copies of plaintiff's Facebook page were submitted as exhibits with the defendant's summary judgment motion. (Doc. 34-10).

Plaintiff testified that the purpose of the Facebook group was "[b]asically to bring together common stereotypes about African Americans and laugh at them" and, she posted stereotypes which she thought were "funny." Plaintiff admitted that she made the posts on the Facebook page under her name. (Doc. 74-1, at 62- 65). The record indicated that plaintiff frequently "liked" and "commented on" racial stereotypes making fun of African-Americans. Plaintiff testified that she did not find it offensive when people who were her "peers" made jokes and comments about racial stereotypes regarding African-Americans, and it was okay for her "peers" to make the racial comments on her Facebook page. Plaintiff further testified her "peers" were individuals who she knew personally and who she "grew up with, in the same neighborhood, went to school with." However, plaintiff stated that it would be offensive if someone who was not her "peer" made such comments. Plaintiff did not know personally many of the individuals whose posts she "liked" or "commented" on in her Facebook page. Plaintiff also complained on Facebook about the conduct that was making her upset at the Hospital. Plaintiff's co-workers at the Hospital were not aware of any Facebook

5

postings made or permitted by plaintiff.

Plaintiff argues that her participation on her Facebook page in the stated Facebook group was an activity outside of the workplace unknown to her co-workers and has no relevance to her claims of racial harassment, constructive discharge, and retaliation against the Hospital.

The Hospital maintains that the comments on plaintiff's Facebook page are relevant in many ways to her claims and to her credibility. The Hospital states that it should be allowed to use plaintiff's Facebook postings to impeach her regarding why she considered some of the comments by her co-workers as offensive based on her explanation that certain racial stereotypes are "funny" if they came from her "peer" group, but were "offensive" if someone who was not her "peer" made such comments.

The Hospital also states that the evidence in this case shows plaintiff "routinely made racially stereotypical comments about African Americans as part of her 'joking' workplace banter" and repeatedly joked around with co-workers. It states that the Facebook evidence is relevant to the question of whether the comments of plaintiff's co-workers were "welcome" and whether "plaintiff initiated or participated in the discussions about which she now complains." As plaintiff recognizes, in order to establish racial harassment she must show that conduct toward her was "unwelcome". Additionally, plaintiff states that "[i]n order to constitute harassment, the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the

6

sense that the employee regarded the conduct as undesirable or offensive."
Clegg v. Falcon Plastics, Inc., 174 Fed.Appx. 18, 25 n. 7 (3d Cir. 2006)
(citation omitted). If plaintiff testifies that she was offended by the comments
of co-workers made about her at work, that they were not welcome, that she
did not incite or solicit them and that these comments caused her to resign,
her Facebook page may undermine such testimony. Her Facebook page may
also substantiate the Hospital's evidence that plaintiff regularly joked with co-
workers and made racial comments at work. *See* Bryant, 2015 WL 7252466,
*3-*4. Also, plaintiff's Facebook page is relevant to the issue of whether
plaintiff by her conduct indicated that the racial joking and comments were
unwelcome and that she regarded the conduct as offensive. Additionally,
plaintiff's claims in this case and the comments on her Facebook page
occurred during the same time frame. Thus, plaintiff's Facebook page raises
an issue as to whether the alleged conduct by plaintiff's co-workers was
unwelcomed by the plaintiff or whether it was invited by plaintiff by her alleged
participation in such conduct. The question of whether the conduct was
unwelcomed and uninvited must be determined by the jury after assessing all
of the evidence, including plaintiff's Facebook page, and the credibility of the
witnesses.

No doubt that some of the comments on plaintiff's Facebook page are
prejudicial to her case. Indeed, some of plaintiff's comments on her Facebook
actually support the claims she asserts in this case and plaintiff has used

these posts to substantiate her claims. Nonetheless, the court finds under FRE 403 that the probative value of this evidence outweighs the risk of unfair prejudice to plaintiff and any confusion of the issues it may cause since it directly relates to the speech and actions of plaintiff in the workplace regarding whether she participated in and solicited the racial comments and jokes with her co-workers. It also relates to whether plaintiff was offended by such conduct at work and whether this conduct forced her to resign since she herself participated in comments containing racial stereotypes and jokes on her Facebook page which were, in part, insensitive and demeaning. (Doc. 34-10). "[T]he fact that probative evidence helps one side prove its case obviously is not ground for excluding it under Rule 403." Goodman, 293 F.3d at 670. "Excluded evidence must be unfairly prejudicial, not just prejudicial." Id.

The distinction from this case with the cases cited by plaintiff in her brief is that there is evidence in this case that at times plaintiff initiated and engaged in racial jokes and comments while at work with co-workers. Although plaintiff denied this evidence in large part in her Affidavit submitted in opposition to the defendants's summary judgment motion, the comments made by plaintiff and the comments liked by her on her Facebook page can be used by the Hospital to challenge her credibility at trial. As mentioned, the credibility of the witnesses is for the jury to weigh. This evidence is also relevant to whether plaintiff truly found the comments made by co-workers as

offensive and unwelcomed. However, the court will limit this evidence to only the comments made by plaintiff on her Facebook page and/or the comments liked by her. The posts made by other persons on plaintiff's Facebook page which plaintiff did not indicate she "liked" and the posts which plaintiff did not comment on will be excluded. Thus, plaintiff's Doc. 59 motion in limine will be granted in part and denied in part as noted above.

The Hospital moves to preclude plaintiff from making any reference to whether Community Health Systems ("CHS") acquired an ownership interest in the Hospital. (Doc. 61). The Hospital points out that in her counterstatement of material facts submitted with respect to its summary judgment, (Doc. 36, ¶ 6), plaintiff stated: "Following the acquisition of the Wilkes-Barre General Hospital by Community Health Systems and the commencement of operations by Defendant under the name of Wilkes-Barre Hospital Company, LLC, Ms. Bryant began to be mocked about her speech patterns and pronunciations by one of Defendant's employees, Amie Stewart." The Hospital states that plaintiff testified that the alleged mocking began when her work area was relocated from the Hospital's Main Building to the Ambulatory Surgery Center. The Hospital also notes that "there is no legal entity 'Community Health Systems'" and that "Community Health Systems, Inc.,..., has a four-levels removed indirect ownership of WBHC, LLC." The Hospital also points out that there has not been any testimony in this case regarding its change in ownership which occurred about 18 months prior to the time when plaintiff's

9

claims accrued. Further, the Hospital states that there has not been any testimony regarding CHS or any act taken by CHS, and that this case involves only the alleged actions of the Hospital's employees. As such, the Hospital contends that its change in ownership status has no bearing on any of the claims which the jury must decide.

Plaintiff states that she should be allowed to reference the acquisition of the Hospital by CHS since it is relevant to establish the time frame of when the alleged inappropriate behavior at the workplace began and when the hostile work environment was created. Plaintiff states that she will show a correlation between the change in ownership of the Hospital and the development of the hostile work environment. She also states that since violations of the Code of Conduct were to be reported to CHS through its corporate compliance office, the fact that CHS acquired the Hospital is relevant. Further, plaintiff states that the corporate structure of the Hospital's organization provides background regarding the corporate culture which allowed the hostile work environment.

The evidence in this case indicated that the Hospital had a Code of Conduct establishing a procedure for employees to report racial harassment, specifically by contacting the HR Department, the facility Ethics and Compliance Officer, the Corporate Compliance and Privacy Officer, or the Confidential Disclosure Program. The Hospital's employees, including plaintiff, received the Hospital's Employee Code of Conduct. Further, the evidence

showed that after plaintiff made Padden and Cernera aware that she was offended by some comments of her co-workers, they did not tell her that she had to follow procedures contained in the Employee Handbook as well as other protocols. Nor did Padden and Cernera provide plaintiff with contact information for any of the personnel identified in the Code of Conduct.

Additionally, Padden admitted that he had a responsibility to report to the authorities identified in the Code of Conduct what plaintiff had told him about the racial comments directed to her and, that he did not report these to the authorities. Cernera also admitted that it is Hospital policy to report claims of harassment to Human Resources.

The court finds that reference to the CHS's acquisition of an ownership interest in the Hospital has relevance to this case and is not unduly prejudicial to the Hospital. As such, it should not be excluded under Federal Rules of Evidence 401 and 403. Thus, the Hospital's Doc. 61 motion in limine will be denied and plaintiff will be allowed to reference CHS's ownership interest in the Hospital.

The Hospital moves to preclude plaintiff from introducing the Pharmacology Workbook into evidence, (Doc. 63), since plaintiff did not remember ever seeing it and since none of the witnesses deposed were familiar with it. The Hospital also points out that the workbook was not responsive to any discovery request. Additionally, it states that the workbook was formulated in February 2001, long before the relevant time of this case.

11

The Hospital also states, "there [is no] testimony or other evidence that the Pharmacology Workbook reflects any policy or practice applicable to the surgical schedulers in 2010 – 2012 (the relevant unit during the relevant time-frame)."

Plaintiff states that the Pharmacology Workbook was produced by the Hospital in response to her requests for documents. She also indicates that Arthur Petrikonis has been added as one of her witnesses for trial to establish the foundation for the corporate policy and the Pharmacology Workbook, and that he will testify that he received the workbook from the Hospital in the course of his nursing training in 2009. Plaintiff states that Mary Beth Moss has also been added as one of her witnesses and that she will testify she used the workbook when she was oriented. Plaintiff contends that the Pharmacology Workbook is "an official corporate document used in the training of newly employed registered nurses" and, that it is "evidence of institutional bias and therefore does not have to be shown to have been directly applicable to the surgical schedulers." Further, plaintiff states the workbook was the official training policy of the Hospital.

The court finds that evidence regarding the Pharmacology Workbook will be allowed under Federal Rules of Evidence 401 and 402 since it is relevant to whether a hostile or abusive workplace environment existed in the Hospital. The court also finds that plaintiff has cured the issues raised by the Hospital with the authentication of the Pharmacology Workbook. To prove her

claim for hostile work environment plaintiff must show that the Hospital's discriminatory conduct was "'severe and pervasive' that it actually 'alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment.'" Burlington News Corp., 759 F.Supp.2d 580, 601 (E.D.Pa. 2010) (quoting Faragher v. Boca Raton, 524 U.S. 775, 786, 118 S.Ct. 2275 (1998)). "In determining whether the conduct at issue is sufficiently extreme to constitute a violation of Title VII, [the court] must consider the 'totality of the circumstances.'" Id. (citations omitted).

An issue in this case relates to how supervisors at the Hospital responded or failed to respond when plaintiff informed them about the inappropriate statements and jokes by co-workers. Also, as indicated, an issue is why supervisors failed to report what plaintiff had told them regarding racial comments by co-workers as provided by the Code of Conduct. Plaintiff is permitted to argue that the existence of institutional animus was the basis for the supervisors' inaction. Thus, the Hospital's Doc. 63 motion in limine will be denied.

As its third motion, the Hospital moves to preclude plaintiff's former co-worker Helen Rosengrant from testifying about her feelings regarding the statements she heard and the statements which she was told about by plaintiff. (Doc. 65).

Rosengrant testified about how the conduct she observed of the

13

workers at the Hospital toward plaintiff had crossed the line. Rosengrant stated that plaintiff's co-workers frequently made "fun of the way she said certain words that ...was pretty much due to her race" and, that the humor of her co-workers was "about [plaintiff's] race a lot." Rosengrant stated that the manner race was used in a lot of jokes regarding plaintiff was offensive and made her personally uncomfortable. Rosengrant added that "[t]hey were seemingly little things, but I think all together they kind of were a pattern of being very focused on [plaintiff's] race." (Doc. 34-8, at 4-6, 14).

The Hospital argues that Rosengrant should only be allowed to testify about the specific factual comments that she overheard and that she should not be allowed to testify about her reaction to these comments since this testimony would be irrelevant and would invade the province of the jury. Plaintiff states that the observations and feelings of Rosengrant are part of the totality of the circumstances that existed at the Hospital where she was subjected to a hostile work environment. The totality of the circumstances the court considers "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc. 510 U.S. 17, 23, 114 S.Ct. 367 (1993). Plaintiff also states that Rosengrant's perception of the comments that she overheard is relevant to the jury's determination of whether a reasonable

14

person under all of the circumstances would find that the discrimination detrimentally affected her.

Federal Rule of Evidence 701 provides that:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"First, a lay opinion must be rationally based on the witness's perception and 'firsthand knowledge of the factual predicates that form the basis for the opinion.'" Hirst v. Inverness Hotel Corp., 544 F.3d 221, 225 (3d Cir. 2008) (citations omitted). Thus, a lay witnesses can testify about a matter based on personal knowledge or observation. "Second, lay opinion testimony must be 'helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'" Id. at 226. A lay witnesses cannot offer an opinion about the ultimate issue of causation and it must meet the test of being helpful to the trier of fact. Thirdly, "admissible lay opinion testimony must 'not [be] based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" Id. at 227. Rule 701 requires that lay opinion testimony must satisfy all of these three criteria in order to be admissible." Id. at 225.

Rosengrant will be permitted to testify about the comments from co-workers which she overheard while working with plaintiff at the Hospital

regardless of whether she recollects who made the comments. She will not be permitted to testify about comments that plaintiff told her about which she did not personally hear, as those would appear to be impermissible hearsay for which the plaintiff has offered no exception. These comments are relevant to plaintiff's claims in this case. Further, Rosengrant will be allowed to testify about her observations of how plaintiff reacted to these comments, including her observations about plaintiff's emotional distress after the comments were made. However, the court finds that under FRE 701 any testimony by Rosengrant as to how she personally was affected by any of the alleged comments "does not inform the jury's assessment in any respect" on the relevant issues in this case. The Hospital is correct that plaintiff must show that the discrimination would detrimentally affect a reasonable person of the same race in her position. Clark County School Dist. v. Breeden, 532 U.S. 268, 270, 121 S.Ct. 1508 (2001). Rosengrant is not of the same race as plaintiff. Also, the jury must assess the alleged comments and conduct of plaintiff's co-workers for their impact on plaintiff and whether they support plaintiff's claims.

As such, Rosengrant will be permitted to testify about the comments and facts she heard and observed, and she will be permitted to characterize them, including whether they were frequent and unusual. Additionally, Rosengrant will by permitted to testify whether the comments created an

uncomfortable atmosphere in the office.  She will also be allowed to testify about her personal observations of how plaintiff reacted to the comments conduct, including whether she observed plaintiff crying. *See* Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996) ("In order to establish a claim for employment discrimination due to an intimidating or offensive work environment, a plaintiff must establish, 'by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee.'") (citations omitted). However, Rosengrant will be precluded from testifying about her own opinion of these comments and facts, and from stating how they personally affected and impacted her since this is not relevant. Thus, the Hospital's Doc. 65 motion in limine will be granted in part and denied in part.

Next, the Hospital moves to preclude Rosengrant from testifying about the reasons for her resignation from the Hospital. (Doc. 67). When Rosengrant resigned her 23-year employment with the Hospital about two months after plaintiff left, Cernera asked if her resignation was because of plaintiff and she said "no." However, during her deposition, Rosengrant stated that what had transpired with plaintiff "was a big influence" on her decision to resign from the Hospital. Rosengrant also testified that it was no longer comfortable working for the Hospital and that it had "[a] lot to do with all that had transpired with [plaintiff]." (Doc. 34-8, at 10-11, 14-15).

The court will deny the Doc. 67 motion since it finds that Rosengrant's testimony about the reasons she resigned from the Hospital, in very close proximity to plaintiff's resignation, is relevant to the overall atmosphere of the work environment which plaintiff allegedly had to endure at the relevant time of her resignation and to whether it was severe enough to affect the psychological stability of plaintiff. *See Aman, supra*. The court also finds that the probative value of Rosengrant's testimony substantially outweighs the risk of unfair prejudice. Even though Rosengrant initially denied that plaintiff had anything to do with her resignation when asked by Cernera, she worked for two more months after plaintiff resigned, and there were other factors in her decision, these facts do not render her testimony inadmissible. Rather, these facts go to Rosengrant's credibility and can be used by the Hospital in cross-examining her.

The Hospital filed an motion in limine on June 17, 2016, (Doc. 78), seeking to exclude under Fed.R.Civ.P. 37(c)(1) plaintiff from presenting four recently identified witnesses at trial, namely, Mary Beth Sanguiliano, Mary Beth Moss, Cornelio Catena and an unidentified "corporate representative of defendant with the most knowledge of [the Pharmacology Workbook]." On June 7, 2016, plaintiff served the Hospital with a Notice to Attend Trial ("NTA") directed to Catena. On June 10 and June 15, 2016, plaintiff served the Hospital with NTA's directed to Sanguiliano and the unnamed corporate

representative. The June 15 NTA also directs the corporate representative to bring a copy of the Pharmacology Workbook to trial. Sanguiliano and Moss are employees of the Hospital and Catena is the Hospital's Chief Executive Officer. The Hospital indicates that Moss was deposed in another case about three years ago by plaintiff's counsel regarding an age discrimination claim against it. The Pharmacology Workbook was produced during discovery in that previous case. The Hospital simultaneously filed its brief in support as well as exhibits. (Doc. 79). On June 22, 2016, the Hospital supplemented its motion stating that plaintiff sent it an additional NTA seeking the testimony of Mark Butsavage, its former Professional Development Trainer. The Hospital also seeks to exclude the testimony of Butsavage. Plaintiff filed her brief in opposition on June 24, 2016, (Doc. 81), and a supplemental brief with attached exhibits on June 30, 2016, (Doc. 82). The Hospital filed a letter brief in reply to plaintiff's supplemental brief on June 30, 2016. (Doc. 83).

Despite the fact that the May 27, 2016 deadline to file motions in limine passed, the court will permit the Hospital's Doc. 78 motion since plaintiff just served it with the NTA's. The Hospital states that plaintiff failed to identify any of the named witnesses in her Rule 26(a) disclosures and failed to identify them during discovery. The Hospital also contends that during discovery plaintiff did not identify a corporate representative who could authenticate and testify about the Pharmacology Workbook in accordance the Rule 30(b)(6)

and that on the eve of trial she is trying to compel the Hospital's representatives to appear as witnesses to remedy her oversight. In its letter brief, (Doc. 83), the Hospital states that simply because plaintiff served interrogatories about the Pharmacology Workbook "does not justify seeking the trial testimony of witnesses who were not identified at any point in pretrial proceedings and who may or may not even know what the document in question is."

Rule 26(a)(1)(A)(I) requires the disclosure of the names of "each individual likely to have discoverable information ... that the disclosing party may use to support its claims or defenses." Rule 26(e) requires a party to supplement or correct its Rule 26(a) disclosures or its discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." The Rule 26 disclosures include the names of trial witnesses. Schmidt v. Mars, Inc., 587 Fed.Appx. 12, 16 (3d Cir. 2014). Rule 37(c)(1) provides that "[i]f a party fails to ... identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that ... witness to supply evidence ... at trial, unless the failure was substantially justified or is harmless." The non-producing party has the burden of proving substantial justification or harmlessness. Norfolk Southern Ry. Co. v. Pittsburgh & West Virginia R.R., 2015 WL 4377766, *2 (W.D.Pa. July 15, 2015) (citations omitted). Under Rule 37, the trial court has discretion to

20

determine if a party provides substantial justification for their delay or if the delay is harmless. Id. (citations omitted).

> In determining whether to exclude a witness, courts should consider:
>
> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order.

Konstantopolous v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir. 1997). An additional consideration is the importance of the excluded testimony. Id. "[T]he exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." McCann v. Miller, 502 Fed.Appx. 163, 172 (3d Cir. 2012) (citation omitted). "The importance of the evidence is often the most significant factor." ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 298 (3d Cir. 2012) (citation omitted).

Plaintiff states that she has included the five new witnesses for purposes of authentication and laying a foundation for the Pharmacology Workbook. Plaintiff states that the Hospital has been aware of the workbook throughout this case and that she was not aware the Hospital declined to stipulate to the authenticity of the workbook until the final pre-trial conference on June 9, 2016. Also, plaintiff has shown in her supplemental brief that she

attached the Pharmacology Workbook to her December 23, 2014 first set of interrogatories addressed to the Hospital and asked it to identify its author, use and purpose, dissemination, the persons who had approved its use, the dates of use and dissemination, and whether it has been withdrawn from dissemination and if so, by whom. Plaintiff states that the Hospital objected to these interrogatories and did not answer them, and that she has identified its response as a trial exhibit. Thus, plaintiff states that she had to belatedly add the Hospital representatives as witnesses to establish the foundation for the workbook and that the Hospital was well aware of her intent to use it at trial during the discovery stage of this case.

There is no dispute that plaintiff failed to list the proposed witnesses in her initial disclosures. Nor were any of the witnesses deposed in this case. There is also no dispute that the witnesses at issue have no knowledge of the facts of this case. Rather, plaintiff only seeks to present the witnesses at trial to authenticate the Pharmacology Workbook which she cannot do without at least one of them. Even though plaintiff first disclosed to the Hospital that she intended to call Moss as a trial witness when she filed her brief in opposition to the Hospital's motion in limine to exclude the Pharmacology Workbook indicating that Moss would testify she used the workbook when she was oriented and she first disclosed that she listed Catena and the unnamed corporate representative as trial witnesses in her pre-trial memorandum, the

22

court will not impose the harsh sanction of excluding all of the witnesses at issue. The Hospital was aware of plaintiff's interrogatories about the Pharmacology Workbook long before the trial date was set. The Hospital had sufficient notice of Moss, Catena and the unnamed corporate representative on June 3, 2016, over five weeks before the trial date. Also, the Hospital has unfettered access to question Moss and Catena about their knowledge of the Pharmacology Workbook limiting any prejudice. Additionally, the extent of the testimony of the proposed witnesses is very narrow and there is no evidence of bad faith or willfulness on the part of the plaintiff. Moreover, as discussed above, testimony regarding the Pharmacology Workbook is important evidence to plaintiff and without the witnesses at issue she will not be able to utilize it at trial.

However, because the court finds the defendant's refusal to stipulate to the authenticity of the workbook somewhat disingenuous and time wasting, it will allow the plaintiff to call Moss and Catena, at present. The other witnesses appear repetitive. Also, the Hospital is directed to bring a copy of the Pharmacology Workbook to trial. Thus, the Hospital's Doc. 78 motion in limine will be granted in part and denied in part.

23

Accordingly, the motions in limine of the parties will be granted in part and denied in part. An appropriate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


**DATED: July 6, 2016**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-1062-03.wpd